F. Thomas Hovore (021518)
HOVORE LAW, PLLC
14300 N. Northsight Blvd., Suite 211
Scottsdale, Arizona 85260
Phone: (480) 361-3466
Fax: (480) 359-4413
Email: tom@hovore.com
*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| AMERICA GREENER TECHNOLOGIES, INC, a Nevada corporation; AMERICA GREENER TECHNOLOGIES CORPORATION, an Arizona corporation; AGT SOFTWAVE, INC., a Nevada corporation, | No. _____ |
| Plaintiffs, | |
| vs. | **COMPLAINT** |
| ENHANCED LIFE WATER SOLUTIONS, LLC, a/k/a EL+ SOLUTIONS, a Utah limited liability company; BRUCE BARKER and KATHLEEN BARKER, husband and wife; BRIAN BARKER and JANE DOE BARKER, husband and wife; STEVEN CLAUSI and MELISSA CLAUSI, husband and wife; GARY WILSON and TAMMIE WILSON; JOHN and JANE DOES 1-100; JOHN DOE CORPORATIONS 1-10; and OTHER JOHN DOE ENTITIES 1-10, | |
| Defendants. | |

For their Complaint against Defendants, Plaintiffs America Greener Technologies, Inc., America Greener Technologies Corporation, and AGT Softwave, Inc. (collectively "AGT" or "Plaintiffs") allege as follows:

## PARTIES, JURISDICTION AND VENUE

### PARTIES

1.   Plaintiff America Greener Technologies, Inc., is now, and has been at all relevant times herein, a Nevada corporation in good standing, which is properly registered in Arizona as a foreign corporation authorized to do business in Arizona.

2.   Plaintiff America Greener Technologies Corporation is now, and has been at all relevant times herein, an Arizona corporation in good standing with the Arizona Corporation Commission.

3.   Plaintiff AGT Softwave, Inc., is now, and has been at all relevant time herein, a Nevada corporation which is properly registered in Arizona as a foreign corporation authorized to do business in Arizona.

4.   Defendant ENHANCED LIFE WATER SOLUTIONS, LLC, a/k/a EL+ SOLUTIONS, ("EL+") is a Utah limited liability company.  Upon information and belief, EL+ is not duly authorized to transact business in Arizona.  Its principal place of business is 950 E. 1240 S. Spanish Fork, UT, 84660.

5.   Defendant Bruce Barker, upon information and belief, is now, and at all relevant times herein was, a citizen and resident of Kingman, Arizona. He is now, and at all relevant times herein was, doing business in, Mohave and Maricopa Counties in Arizona as well as in multiple counties in California, and he is and was directly involved in all the events, conduct and/or omissions ("the transactions") alleged herein.

6.   It is believed Bruce Barker is now or was married  to Kathleen Barker during the relevant times herein, and he committed and continues to commit the acts and omissions and participated and continues to participate in the transactions set forth herein for his own benefit and for the benefit of the marital community of him and his wife.

7.   Defendant Brian Barker, upon information and belief, is now, and at all relevant times herein was, a citizen and resident of Kingman, Arizona. He is now, and at

2

all relevant times herein was, doing business in, Mohave and Maricopa Counties in Arizona as well as in multiple counties in California, and he is and was directly involved in the transactions alleged herein.

8.   It is unknown whether or not Brian Barker is now or was married during the relevant times herein, but if so, he committed the acts and omissions and participated in the transactions set forth herein for his own benefit and for the benefit of the marital community of him and his wife, Defendant Jane Doe Barker, who upon information and belief is also a citizen and resident of Arizona, and whose real name will be substituted by amendment to this Complaint when made known to Plaintiffs.

9.   Defendant Steven Clausi ("Clausi"), upon information and belief, is now, and at all relevant times herein was, a citizen and resident of Kingman, Arizona. He is now, and at all relevant times herein was, doing business in, Mohave and Maricopa Counties in Arizona as well as in multiple counties in California, and he is and was directly involved in the transactions alleged herein.

10.  It is believed he is now or was married to Melissa Claussi during the relevant times herein, and he committed the acts and omissions and participated in the transactions set forth herein for his own benefit and for the benefit of the marital community of him and his wife.

11.  Defendant Gary Wilson ("Wilson"), upon information and belief, is now, and at all relevant times herein was, a citizen and resident of Kingman, Arizona. He is now, and at all relevant times herein was, doing business in, Mohave and Maricopa Counties in Arizona as well as in multiple counties in California, and he is and was directly involved in the transactions alleged herein.

12.  It is believed he is now or was married to Tammie Wilson during the relevant times herein, but if so, he committed the acts and omissions and participated in the transactions set forth herein for his own benefit and for the benefit of the marital community.

**JURISDICTION AND VENUE**

13.   This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1367(a), 35 U.S.C. § 281, and 18 U.S.C. § 1964(a) and (c) because this action includes claims that arise under the laws of the United States, including claims for patent infringement and claims for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), in addition to claims that arise under the laws of the State of Arizona.

14.   This Court has personal jurisdiction over all Defendants and venue is proper in this District under 28 U.S.C. §§ 1391(b) and 1400(b), 35 U.S.C. § 281, and 18 U.S.C. § 1965(a) because all Defendants are residents of, or transacted business in, or caused certain of the events alleged herein to occur in, Arizona, and this action includes claims for patent infringement and civil racketeering by Defendants.

**ALLEGATIONS COMMON TO ALL COUNTS**

15.   AGT comprises companies that, among other things, provide water treatment services to commercial clients through implementation of equipment which they manufactures ("Equipment").

16.   The Equipment AGT utilizes to service its clients is a patented-process which is registered with the United States Patent Office as Patent No. 8,477,003 and Serial No. 13/262,227 and is titled "Apparatus for Generating a Mutli-Vibrational Field" ("the Patent"). A copy of the Patent is attached as Exhibit 1.

17.   AGT purchased the Patent from the co-inventors, Michael Dean Brown and Defendant Wilson, of the Equipment.

18.   The co-inventors assigned the Patent ("Assignment") to AGT on September 10, 2014, and registered with the United States Patent Office. A true and accurate copy of the Assignment is attached as Exhibit 2.

///

4

19. On October 31, 2014, Plaintiffs and Soft Wave Innovations, Inc. entered into an Asset Purchase Agreement whereby Plaintiffs acquired the assets of Soft Wave Innovations, Inc. in exchange for 775,000 shares of AGTI stock.

20. Defendant Wilson was a controlling shareholder of Soft Wave Innovations, Inc. and executed the Asset Purchase Agreement on behalf of Soft Wave Innovations, Inc.

21. Included in the Asset Purchase Agreement was access to several of Soft Wave Innovations, Inc.'s current clients which were subsequently serviced by AGT.

22. AGT hired Defendants Brian Barker, Bruce Barker and Clausi as employees to assist with implementing and servicing of the Equipment for AGT's clients, including those newly obtained pursuant to the Asset Purchase Agreement.

23. Upon information and belief, prior to their employment by AGT, Defendants Brian Barker, Bruce Barker and Clausi had knowledge as to the products or services offered by Soft Wave Innovations, Inc. but AGT trained them on new equipment only offered by AGT.

24. Defendants Brian Barker, Bruce Barker and Clausi all signed Mutual Non-Disclosure and Confidentiality Agreements ("Confidentiality Agreement") as a requirement of their employment. Contained in those agreements is a five-year restrictive covenant regarding AGT's confidential information. A true and accurate copy of Brian Barker's Confidentiality Agreement is attached as Exhibit 3.

25. During the employment of Defendants Brian Barker, Bruce Barker and Clausi, AGT had written service contracts with many companies including companies that had been prior AGT clients and companies that became clients after the Soft Wave Innovations, Inc. asset purchase.

26. In May 2015, AGT terminated the employment of Defendants Brian Barker, Bruce Barker and Clausi.

27. Upon information and belief, Defendant Wilson has been manufacturing equipment ("Infringement Equipment") in his garage that is identical, or nearly identical,

to the Equipment protected by the Patent that AGT utilized under the Assignment.

28. Upon information and belief, Defendants Brian Barker, Bruce Barker and Clausi, are and have been selling, leasing and or renting the Infringement Equipment to companies in Arizona and California.

29. As a result of Defendants Brian Barker's, Bruce Barker's and Clausi's acts, within the past several months, at least four companies have terminated their contracts with AGT, including two companies that were part of the Soft Wave Innovations, Inc. asset purchase.

30. Upon information and belief, the Defendants formed and operated under the EL+ business entity.

31. Upon information and belief, Defendants Brian Barker, Bruce Barker and Clausi currently service the Infringement Equipment they have sold, leased and/or rented to at least four companies that have terminated their contracts with AGT, including two companies that were part of the Soft Wave Innovations, Inc. asset purchase.

## CAUSES OF ACTION

### COUNT I

### (Patent Infringement by All Defendants)

32. All the foregoing allegations are repeated as if set forth again in full.

33. Defendant Wilson's acts alleged herein, including, but not limited to, the manufacturing of the Infringement Equipment constitutes a willful violation and infringement of AGT's Patent rights under 35 U.S.C. § 271.

34. Defendants Brian Barker's, Bruce Barker's and Clausi's acts alleged herein, including but not limited to, knowingly marketing, selling and servicing of the Infringement Equipment constitutes a willful violation of AGT's Patent rights under 35 U.S.C. § 271.

35. Plaintiffs have given notice to all Defendants of their infringement of AGT's Patent, but Defendants have failed and/or refused to cease such infringement.

36. Therefore, under 35 U.S.C. §§ 281 and 283, Plaintiffs are entitled to and

demand immediate injunctive relief to prohibit and stop any further infringement of AGT's Patent rights by Defendants.

37. In addition, as a proximate result of Defendants' infringement of AGT's Patent rights, Plaintiffs have suffered economic losses for which they are entitled to recover damages from Defendants under 35 U.S.C. §§ 281 and 284, in an amount to be proven at trial, but not less than $1,500,000, plus interest thereon at the maximum amount allowed by law from the date of the breaches, in addition to Plaintiff's costs and reasonable attorney's fees under 35 U.S.C. § 285.

## COUNT II

### (Breaches of Contract by Defendants Brian Barker, Bruce Barker and Clausi)

38. All the foregoing allegations are repeated as if set forth again in full.

39. The Confidentiality Agreement that Defendants Brian Barker, Bruce Barker and Clausi entered into with AGT, as described above, constitute valid, binding and enforceable contracts between AGT and said Defendants.

40. By utilizing the confidential information obtained during their employment by AGT to market and service equipment identical to AGT's Patented Equipment, Defendants Brian Barker, Bruce Barker and Clausi violated and breached their Confidentiality Agreements.

41. As a proximate result of said Defendants' breaches of their express contracts with AGT, Plaintiffs suffered economic losses for which they are entitled to recover compensatory, consequential and incidental damages from said Defendants in an amount to be proven at trial, but not less than $500,000, plus interest thereon at the maximum amount allowed by law from the date of the breaches, in addition to Plaintiff's costs and reasonable attorney's fees.

## COUNT III
### (Breaches of Implied Covenant of Good Faith and Fair Dealing by Defendants Brian Barker, Bruce Barker and Clausi)

42. All the foregoing allegations are repeated as if set forth again in full.

43. The employment and Confidentiality Agreements between AGT and

Defendants Brian Barker, Bruce Barker and Clausi include implied covenants of good faith and fair dealing.

44.  As described above, Defendants Brian Barker, Bruce Barker and Clausi acted in bad faith in a manner adverse to the purposes of the contracts between them and AGT and AGT's reasonable expectations thereunder by, including but not limited to, failing and/or refusing to protect AGT's confidential information.

45.  By their conduct alleged herein, Defendants Brian Barker, Bruce Barker and Clausi intentionally, willfully, maliciously, and wantonly acted in reckless disregard of Plaintiffs' rights. As a result of such conduct, said Defendants breached their covenants of good faith and fair dealing.

46.  As a proximate result of said Defendants' breaches of the covenants of good faith and fair dealing, Plaintiffs are entitled to recover punitive damages from said Defendants in amounts to be determined at trial.

## COUNT IV
### (Conversion by All Defendants)

47.  All the foregoing allegations are repeated as if set forth again in full.

48.  Defendants, individually and/or collectively, misused and misappropriated for his own use and benefit the Patented technology that AGT owns.

49. By their conversion of AGT's Patented technology, Defendants acted intentionally, willfully, maliciously and wantonly in reckless disregard of AGT's rights.

50.  As a proximate result of Defendants' conversion, Plaintiffs suffered economic losses for which they are entitled to recover from Defendants compensatory damages in an amount to be proven at trial, but not less than $500,000, plus interest thereon at the maximum rate allowed by law, in addition to punitive damages, and costs and attorney's fees in amounts to be determined at trial.

## COUNT V
### (Unjust Enrichment of All Defendants)

51.  All the foregoing allegations are repeated as if set forth again in full.

52. Upon information and belief, Defendants received money or other

compensation as a result of their acts alleged herein and economic benefit therefrom.

53.  As a proximate result of Defendants' wrongful acts, they have been unjustly enriched to Plaintiffs' detriment, impoverishment and economic loss for which Plaintiffs are entitled to recover from Defendants, jointly and severally, compensatory, consequential and incidental damages in an amount to be proven at trial, but not less than $500,000 plus interest thereon at the maximum rate allowed by law, in addition to consequential and punitive damages in amounts to be determined at trial, and reasonable attorney's fees and costs incurred herein.

## COUNT VI

### (Tortious Interference with Contractual Relations by All Defendants)

54.  All the foregoing allegations are repeated as if set forth again in full.

55.  With full knowledge of AGT's existing contractual relationships with its clients, including those obtained pursuant to the Soft Wave Innovations, Inc. asset purchase and AGT's reasonable expectancies and economic advantages arising there-from, Defendants, without justification, by their acts alleged herein, wrongfully and recklessly with malice, ill will, and/or intent to injure AGT and to benefit said Defendants, they tortiously interfered with AGT's contractual relationships with those companies.

56.  Defendants' wrongful interferences constitute tortious interferences with Plaintiff's existing contractual relationships and reasonable expectancies and economic advantages therefrom.

57.  As a proximate result of Defendants' tortious interferences, Plaintiffs suffered economic losses for which they are entitled to compensatory, consequential and incidental damages in amounts to be proven at trial, but not less than $500,000, plus punitive damages, costs, and reasonable attorney's fees and costs in amounts to be determined at trial.

## COUNT VII

### (Unlawful, Deceptive, Fraudulent and Unfair Business and Trade Practices by All Defendants)

58.  All the foregoing allegations are repeated as if set forth again in full.

59. By their separate and/or collective acts and omissions, alleged herein, Defendants engaged in unlawful, deceptive, fraudulent and/or unfair business and trade practices.

60. As a proximate result of Defendants' unlawful, deceptive, fraudulent and/or unfair business and trade practices, committed separately and/or in concert with each other, Plaintiffs have suffered economic losses for which they are entitled to recover compensatory, consequential and incidental damages from Defendants in an amount to be proven at trial, but not less than $500,000, plus reasonable attorneys' fees and costs in amounts to be determined at trial.

## COUNT VIII

### (Aiding and Abetting by All Defendants)

61. All the foregoing allegations are repeated as if set forth again in full.

62. By their individual and/or collective acts, conduct and/or omissions alleged herein, Defendants Wilson, Brian Barker, Bruce Barker and Clausi facilitated, enabled or aided and abetted each Defendant's unlawful and wrongful acts alleged herein.

63. As a proximate result of said Defendants' facilitating, enabling or aiding and abetting the unlawful and wrongful acts alleged herein, Plaintiffs suffered economic losses for which they are entitled to recover compensatory, consequential and incidental damages in amounts to be proven at trial, but not less than $500,000, plus punitive damages, costs and reasonable attorney's' fees.

## COUNT IX

### (Civil Conspiracy of All Defendants)

64. All the foregoing allegations are repeated as if set forth again in full.

65. Upon information and belief, for their own individual benefit and purpose, Defendants each intentionally, willfully, maliciously, wantonly and with reckless disregard of AGT's rights, conspired and acted in concert with two or more persons or entities, or participated in, facilitated, enabled or aided and abetted such conspiracies, to

1   commit all or some of the unlawful and wrongful acts alleged herein pursuant to a com-

2   mon plan or scheme.

3      66.  Therefore, each of these Defendants is responsible for, and jointly and sever-

4   ally liable with the other Defendants to Plaintiffs, for conspiring to enter into such

5   common plan or scheme to accomplish one or more of the unlawful purposes alleged

6   herein or to accomplish a lawful object by any of the unlawful means alleged herein.

7      67.  As the proximate result of each Defendant's conspiracy or conspiracies,

8   Plaintiffs suffered economic losses, for which they are entitled to recover from Defen-

9   dants, jointly and severally, compensatory, consequential and incidental damages in

10   amounts to be proven at trial, but not less than $500,000, plus punitive damages in an

11   amount to be determined at trial.

### COUNT X
**(Unlawful Acts and Prohibited Activities by All Defendants
under 18 U.S.C. § 1964(a) and (c) of RICO)**

      68.  All the foregoing allegations are repeated as if set forth again in full.

      69.  By each Defendant's wrongful acts and omissions described herein, each

Defendant did and continue to unlawfully receive income derived, directly or indirectly,

from a pattern of illegal activity within the meaning of 18 U.S.C. § 1961(1)(B) and (5) in

which each Defendant did and continues to participate as a principal within the meaning

of 18 U.S.C. § 2 to use, directly or indirectly, any part of such income, or the proceeds of

such income, in the operation of an enterprise, within the meaning of 18 U.S.C. § 1961(4),

engaged in, or the activities of which affect, foreign commerce within the meaning of 18

U.S.C. § 10. Such unlawful conduct is a prohibited activity within the meaning of 18

U.S.C. § 1962(a).

      70.  By such acts and omissions, each Defendant unlawfully acquired or

maintained, directly or indirectly, an interest in or control of an enterprise, within the

meaning of 18 U.S.C. § 1961(4), engaged in, or the activities of which affect, foreign

commerce within the meaning of 18 U.S.C. § 10. Such unlawful conduct is a prohibited

activity within the meaning of 18 U.S.C. § 1962(b).

71.   By such acts and omissions, each Defendant is, and was at relevant times herein, employed by or associated with an enterprise within the meaning of 18 U.S.C. § 1961(4) that was unlawfully engaged in, or the activities of which affect foreign commerce within the meaning of 18 U.S.C. § 10, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of illegal activity within the meaning of 18 U.S.C. § 1961(1)(B) and (5). Such unlawful conduct constitutes prohibited activity within the meaning of 18 U.S.C. § 1962(c).

72.   By such acts and omissions, each Defendant did and continues to unlawfully conspire to violate the provisions of 18 U.S.C. § 1962(a), (b) or (c). Such unlawful conduct is a prohibited activity within the meaning of 18 U.S.C. § 1962(d).

73.   Within the meaning of 18 U.S.C. § 1961(1)(B) and (5), the pattern of illegal activity referred to above includes two or more uses of the U.S. mail, telephone, the Internet, and wire transfers as alleged herein by each Defendant, which constitute indictable acts of mail and wire fraud within the meaning of 18 U.S.C. §§ 1341 and 1343, respectively.

74.   Within the meaning of 18 U.S.C. § 1961(4), the enterprise referred to above includes the association of each of the individual Defendants, who were and who continue to be associated in fact although that association-in-fact was not a legal entity.

75.   The pattern of Defendants' unlawful conduct and prohibited activities described herein exhibits the threat of being continuous.

76.   As a proximate result of Defendants' unlawful conduct and prohibited activities described herein, which constitute violations of 18 U.S.C. § 1962 of RICO, Plaintiffs were and continue to be injured in their business and property for which they are entitled to injunctive relief to prevent future occurrences of such unlawful conduct and prohibited activities, and to recover from Defendants treble the damages they sustained therefrom in addition to their reasonable attorney's fees and costs incurred herein under 18 U.S.C. § 1964(c) of RICO.

///

**COUNT XI**

**(Unlawful Acts and Pattern of Unlawful Activity by All Defendants
under A.R.S. § 13-2314.04)**

77.   All the foregoing allegations are repeated as if set forth again in full.

78.   Under A.R.S. §§ 13-2301(D)(4)(b), 13-2310 and 13-2314.04, Defendants'
acts and omissions alleged herein, constitute unlawful acts, and/or a pattern of unlawful
activity within the meaning of A.R.S. § 13-2314.04(T)(3) consisting of two or more rela-
ted and continuous acts, including, but not limited to theft, extortion, intentional or
reckless fraud relating to theft and/or a scheme or artifice to defraud within the meaning
of A.R.S. § 13-2310(E), and/or participating in a criminal syndicate within the meaning
of A.R.S. §§ 13-2301(C)(7) and 13-2308(A) and (C).

79.   Defendants committed and/or aided and abetted, and are continuing to
commit and/or aid and abet, such unlawful acts and/or pattern of unlawful activity for
financial or other gain within the meaning of A.R.S. § 13-2314.04(T)(2), from which they
knowingly obtained and continue to obtain such gain, and for which such unlawful acts
and/or pattern of unlawful activity are chargeable or indictable and punishable by
imprisonment for more than one year under Arizona law.

80.   Within the meaning of A.R.S. § 13-2312(A), Defendants, acting separately
and/or in concert with each other, also did and continue to knowingly and illegally control
directly or indirectly, and/or aid and abet the control of, an enterprise, as defined by
A.R.S. § 13-2301(D)(2), including, but not limited to the association-in-fact of these
Defendants, through such unlawful acts and/or pattern of unlawful activity.

81.   Within the meaning of A.R.S. § 13-2312(B), Defendants, acting separately
and/or in concert with another, also did and continue to knowingly and illegally conduct
an enterprise by being associated with, or otherwise participating or conspiring to parti-
cipate in, such enterprise as described above, whose affairs were and are continuing to be
conducted through said unlawful acts or pattern of unlawful activity, or by participating
directly or indirectly in an enterprise that they knew was, and continue to know is, being
conducted through unlawful acts or pattern of unlawful activity.

82.   Pursuant to A.R.S. § 13-2314.04(A), as a proximate result of Defendants' schemes or artifices to defraud, unlawful acts, pattern of unlawful activity and/or illegal control, conduct or participation in an enterprise through such unlawful acts, Plaintiffs suffered and continue to suffer reasonably foreseeable economic losses to their property in amounts to be proven at trial, but not less than $500,000 for which they are entitled to injunctive relief to prevent future occurrences of such unlawful conduct and prohibited activities, and to recover from Defendants treble damages, interest, and costs and reasonable attorney's fees in amounts to be determined at trial.

83.   Proper notice with a copy of this Complaint has been served, or will be served within 30 days, on the Arizona Attorney General pursuant to A.R.S. § 13-2314.04(H).

## COUNT XII
### (Breaches of Implied Covenant of Good Faith and Fair Dealing by Defendant Wilson)

84.   All the foregoing allegations are repeated as if set forth again in full.

85.   The Soft Wave Innovations, Inc. Asset Purchase Agreement to which Defendant Wilson was the signatory for the Seller included implied covenants of good faith and fair dealing.

86.   As described above, Defendant Wilson acted in bad faith in a manner adverse to the purposes of the contract with AGT and AGT's reasonable expectations thereunder by, including but not limited to, intentionally stealing the clients it had passed to AGT as part of the Asset Purchase Agreement.

87.   By his conduct alleged herein, Defendant Wilson intentionally, willfully, maliciously, and wantonly acted in reckless disregard of Plaintiffs' rights. As a result of such conduct, said Defendant breached his covenants of good faith and fair dealing.

88.   As a proximate result of said Defendant's breaches of the covenants of good faith and fair dealing, Plaintiffs are entitled to recover punitive damages from said Defendant in amounts to be determined at trial.

///

///

14

**PRAYER**

WHEREFORE, Plaintiffs pray for judgment against Defendants, jointly and severally, as follows:

1. Restraining and enjoining Defendants from committing any further (a) infringement of Plaintiffs' Patent, (b) unauthorized use of Plaintiffs' confidential information, trade secrets and/or intellectual property, (c) breaches of tortious interference with Plaintiffs' contractual relations with others, and (d) unlawful conduct and prohibited activities described above;

2. Compensatory, consequential and incidental damages in amounts under all Counts to be determined at trial, but not less than $2,000,000;

3. Pre-judgment and post-judgment interest on the foregoing amounts at the maximum rate allowed by law;

4. Punitive damages in an amount to be determined at trial;

5. Reasonable attorney's fees and costs in amounts to be determined at trial; and

6. For any other and further relief as the Court deems just.

**JURY TRIAL DEMAND**

Plaintiffs demand a jury trial on all issues that are triable by a jury.

DATED this 7th day of December, 2015.

HOVORE LAW, PLLC

 /s/ *F. Thomas Hovore*
F. Thomas Hovore, Esq.
Arizona Bar No. 021518
14300 N. Northsight Blvd., Suite 211
Scottsdale, Arizona 85260
Telephone: (480) 361-3466
Email: tom@hovore.com
*Attorney for Plaintiffs*

## **VERIFICATION**

Pursuant to A.R.S. § 13-2314.04(O) and (P), I, F. Thomas Hovore, Esq., as the attorney for Plaintiffs, hereby verify that I have carefully read the foregoing Complaint and, based on a reasonable inquiry, I believe all of the following:

1. It is well grounded in fact.

2. It is warranted by existing law or there is a good faith argument for the extension, modification or reversal of existing law.

3. It is not made for any bad faith, vexatious, wanton, improper or oppressive reason, including to harass, to cause unnecessary delay, to impose a needless increase in the cost of litigation or to force an unjust settlement through the serious character of the averments set forth therein.

/s/ *F. Thomas Hovore*
F. Thomas Hovore, Esq.
*Attorney for Plaintiffs*

16

EXHIBIT 1



US 20130293327A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: **US 2013/0293327 A1**
Wilson et al. (43) Pub. Date: **Nov. 7, 2013**

(54) **APPARATUS FOR GENERATING A MULTI-VIBRATIONAL FIELD**

(71) Applicants: **Gary Dean Wilson**, Dolan Springs, AZ (US); **Michael Dean Brown**, White Hills, AZ (US)

(72) Inventors: **Gary Dean Wilson**, Dolan Springs, AZ (US); **Michael Dean Brown**, White Hills, AZ (US)

(21) Appl. No.: **13/932,965**

(22) Filed: Jul. 1, 2013

**Related U.S. Application Data**

(63) Continuation of application No. 13/262,227, filed on Sep. 29, 2011, now Pat. No. 8,477,003, filed as application No. PCT/US2010/029017 on Mar. 29, 2010.

(60) Provisional application No. 61/164,549, filed on Mar. 30, 2009.

**Publication Classification**

(51) **Int. Cl.**
  *H01F 3/10* (2006.01)
(52) **U.S. Cl.**
  CPC ........................................ *H01F 3/10* (2013.01)
  USPC ........................................................ 335/297

(57) **ABSTRACT**

An apparatus may deliver multi-vibrational electromagnetic (MVEM) fields which are independent but may work simultaneously. The MVEM fields may be used in many applications, including eliminating calcium build-up in pipes, reducing soap usage in laundry, reducing salt usage in water softeners, reducing chlorine use in pools, inhibiting algae growth, increasing water clarity, restructuring or inhibiting nitrates, restructuring or inhibiting tannins, restructuring or inhibiting calcium salts and other minerals, treating pain, treating inflammation, enhancing after-surgery healing, and improving circulation in treated areas of animals and humans. The apparatus may be formed from a plurality of wire-wrapped rods connected to a power supply. The plurality of rods may be incased in flexible foam and wrapped in a fabric outer covering.



US 2013/0293327 A1

Nov. 7, 2013

1

## APPARATUS FOR GENERATING A MULTI-VIBRATIONAL FIELD

### CROSS-REFERENCE TO RELATED APPLICATIONS

[0001]   This application claims the benefit of U.S. Provisional patent application No. 61/164,549 filed Mar. 30, 2009.

### BACKGROUND OF THE INVENTION

[0002]   The present invention generally relates to electromagnetism and, more particularly, to an apparatus that may deliver electromagnetic multi-vibrations fields that are independent but work simultaneously.

[0003]   Magnetic fields have been used in various applications, such as therapeutic applications for treating the human body and water cleaning applications. A conventional electromagnetic water treatment apparatus may include an electric field and a magnetic field to prevent the occurrence and attachment of scale and rust along a channel used for the circulation of water. The presently available electromagnetic water treatment apparatus is so designed that a pair of permanent magnets and a pair of electrodes, composed of different metals, are attached to a casing, and along with the casing, collectively define a water passage.

[0004]   According to the principle incorporated into this conventional apparatus, a magnetic field, which is generated by the permanent magnets, and an electric field, which is generated by a weak current that is fed to the electrodes, are applied to water flowing through the water passage, which is defined by the casing and the permanent magnets. The fields generated by conventional water treatment apparatus may hold metal shavings due to the magnetic field generated. Such an electromagnetic field may not be suitable for use in other applications, such as human therapeutic applications.

[0005]   As can be seen, there is a need for an apparatus to generate an electromagnetic field that may be used in various applications, such as therapeutic applications for humans, water treatment and purification and the like.

### SUMMARY OF THE INVENTION

[0006]   In one aspect of the present invention, an apparatus comprises a plurality of rods; a non-conductive coating on at least a portion of each of the rods; a wire wrapped around the non-conductive coating of each of the rods; one end of the wire of a first rod connected to a first line of a DC power supply; a second end of the wire of a first rod connected to a wire end of an adjacent rod; one end of the wire of the last rod connected to a second line of the DC power supply; a second end of the wire of the last rod connected to a wire end of an adjacent rod; and each of the plurality of rods between the first rod and the last rod having first and second ends of wire connected to wire ends of each adjacent rod.

[0007]   In another aspect of the present invention, a method for generating a multi-vibrational electromagnetic field comprises moving current through a plurality of copper wire coils, each of the copper wire coils wrapped around a rod, each of the rods disposed substantially parallel to each other.

[0008]   In a further aspect of the present invention, an electromagnetic apparatus for delivering multi-vibrational fields comprises a plurality of spaced apart elongated rods with opposing ends, the rods partially covered with a non-conductive coating leaving the opposing ends of the rods uncovered; copper wire wrapped around each of the plurality of elon-

gated rods, over the non-conductive coating, forming a plurality of copper coils connected in sequence to a power supply; a spacer strip attached to each end of the elongated rods; and a flexible housing for containing the plurality of copper coils.

[0009]   These and other features, aspects and advantages of the present invention will become better understood with reference to the following drawings, description and claims.

### BRIEF DESCRIPTION OF THE DRAWINGS

[0010]   FIG. 1 is a side view of a rod used in an embodiment of the present invention;

[0011]   FIG. 2 is a side view of the rod of FIG. 1 wrapped in a non-conductive coating, according to an embodiment of the present invention;

[0012]   FIG. 3 is a side view of the coated rod of FIG. 2 wrapped with copper wire, according to an embodiment of the present invention;

[0013]   FIG. 4 is a perspective view of a plurality of the wire-wrapped rods of FIG. 3, connected in parallel, according to an embodiment of the present invention;

[0014]   FIG. 5 is a close-up view of the connection between adjacent coils, according to an embodiment of the present invention;

[0015]   FIG. 6 is a close-up view of the connection of FIG. 5;

[0016]   FIG. 7 is a close-up view of the connection of FIG. 5 shrink-wrapped according to an embodiment of the present invention;

[0017]   FIG. 8 is a perspective view of a plurality of wire-wrapped rods of FIG. 3, connected in parallel prior to testing a Gauss field, according to an embodiment of the present invention;

[0018]   FIG. 9 is a perspective view of the plurality of wire-wrapped rods of FIG. 8, installed into a foam pad, according to an embodiment of the present invention;

[0019]   FIG. 10 is a perspective view of the installed rods of FIG. 9, fully encased in a foam pad, according to an embodiment of the present invention;

[0020]   FIG. 11 is a perspective view of a soft wave apparatus, according to an embodiment of the present invention; and

[0021]   FIG. 12 is a perspective view of the electromagnetic Gauss field generated by the soft wave apparatus of FIG. 11.

### DETAILED DESCRIPTION OF THE INVENTION

[0022]   The following detailed description is of the best currently contemplated modes of carrying out exemplary embodiments of the invention. The description is not to be taken in a limiting sense, but is made merely for the purpose of illustrating the general principles of the invention, since the scope of the invention is best defined by the appended claims.

[0023]   Various inventive features are described below that can each be used independently of one another or in combination with other features.

[0024]   Broadly, an embodiment of the present invention provides a soft wave apparatus that may deliver multi-vibrational electromagnetic (MVEM) fields which are independent but may work simultaneously. The MVEM fields may be used in many applications, including eliminating calcium build-up in pipes, reducing soap usage in laundry, reducing salt usage in water softeners, reducing chlorine use in pools, inhibiting algae growth, increasing water clarity, restructur-

2

ing or inhibiting nitrates, restructuring or inhibiting tannins, restructuring or inhibiting calcium salts and other minerals, treating pain, treating inflammation, enhancing after-surgery healing, and improving circulation in treated areas of animals and humans.

[0025]   In an exemplary embodiment, the soft wave apparatus may be formed from a plurality of wire-wrapped rods connected to a power supply. The plurality of rods may be incased in flexible foam and wrapped in a fabric outer covering.

[0026]   Referring to FIG. 1, a rod 10 may be formed by cutting the rod 10 to the appropriate length 12. The ends 14 of the rods may be ground to avoid sharp edges. The length 12 of the rod 10 may vary with its intended application and may be from about 3 inches to about 12 inches, typically from about 4 inches to about 10 inches. The rod 10 may have a diameter 16 that may vary with its intended application and may be from about 1/16 inch to about 1/2 inch, typically about 1/8 inch to about 1/4 inch. The rod 10 may be made from a metal, typically a conductive metal, such as cold rolled steel.

[0027]   Referring to FIGS. 2 and 3, the rod 10 may be wrapped with a non-conducting coating 18, with about 1/2 inch bare at each of the ends 14. The rod 10 may be wrapped with a conducting wire 20, such as a copper wire. The wire 20 may wrap from one end 14-1 of the rod 10 to the other end 14-2 of the rod 10. The wire 20 may be wrapped upon itself so that the wire begins and ends at the same end 14-1 of the rod 10. For example, four layers of wire 20 (from end 14-1 to end 14-2, from end 14-2 to end 14-1, from end 14-1 to end 14-2, and from end 14-2 to end 14-1) may be wrapped around the rod 10. The wire 20 may be a copper wire between about 36 gauge to about 10 gauge, typically from about 28 gauge to about 18 gauge.

[0028]   Referring now to FIG. 4, a plurality of rods 10 may be wrapped with wire 20, as described above. The rods 10 may be laid out substantially parallel to each other. One end 14-2 of the rods 10 may be connected with a separation strip 22. The other end 14-1 of the rods 10 may be temporarily inserted into a spacer jig 24. Typically, between 3 and 30 rods 10 may be used, often between 5 and 20 rods are used. The spacing between the rods 10 may be between 1/2 inch and about 2 inches. The number of rods, the number of windings on the rods, and the spacing between the rods may be a function of the intended use of the soft wave apparatus. For example, for calcium control, salt reduction and therapeutic applications, the spacing between rods 10 may be about 1.375 inches.

[0029]   Referring to FIGS. 5 and 6, an inner wire end 20-1 of the wire 20 of one rod 10-1 may be electrically connected to an outer wire end 20-2 of the wire 20 of an adjacent rod 10-2. This inner/outer electrical connection sequence may be repeated for each of the rods 10 in the plurality of rods. The wires ends 20-1, 20-2 may be trimmed and soldered together as shown in FIG. 6.

[0030]   Referring to FIGS. 7 and 8, an alternating current (AC) to direct current (DC) transformer 26 may be connected to the rods 10. A positive DC lead 28 may connect to a first one of the rods 10-3 and a negative DC lead 30 may connect to a last one of the rods 10-4. The polarity of the above described connections may be reversed. The soldered wire ends 20-1, 20-2 may be shrink-wrapped with conventional shrink wrap tape. A spacer strip 32 may replace the spacer jig 24. The spacer strip 32 and the separation strip 22 may be formed of the same or different materials. The strips 32, 22 may be

flexible, yet retain the spacing between adjacent rods 10. The transformer 26 may be connected to a power source, such as typical 60 Hertz (Hz) 105-120 volts (V) AC and the Gauss field may be tested with a conventional Gauss field meter, for example.

[0031]   The transformer 26 may deliver DC voltage and current that may vary with the intended use of the soft wave apparatus. For example, the transformer 26 may deliver from about 3 V to about 30 V DC, typically from about 5 V to about 24 V DC. The transformer 26 may deliver from about 0.3 to about 5 amps (A), typically from about 1 to about 3 A.

[0032]   Referring to FIGS. 9 through 12, the electrically connected rods 10 may be sealed in a foam pad 32. The foam pad 32 may be trimmed, if necessary, and the finished product may optionally be wrapped in an outer covering 34, as shown in FIG. 11. The resulting soft wave apparatus 36 may create an electromagnetic Gauss field 38, as shown in FIG. 12. The soft wave apparatus 36 may be used in various applications as described below.

[0033]   Salt reduction in a water softener may be achieved by wrapping the soft wave apparatus 36 around a water pipe before it enters the softener. The salt settings may then be reduced by about 50% or more. Salt usage field testing has shown a 70% reduction in salt usage while maintaining 0 to 4 grains of water hardness.

[0034]   Calcium control may be achieved by wrapping the soft wave apparatus 36 around a main water line. For even better results, the soft wave apparatus 36 may be wrapped around the main water line and the hot side of a water heater. Such a system may reduce or prevent calcium buildup in all water uses. This system may also reduce the amount of soap for laundry from about 1 cup to about 1/8 cup.

[0035]   By wrapping the soft wave apparatus 36 around a circulation line of a swimming pool, chlorine usage was reduced by 66% while still maintaining the required residual chlorine levels. New calcium scale build-up was prevented, water clarity was improved and algae growth was inhibited.

[0036]   For human and pet use, the soft wave apparatus 36 may be placed over a sore, inflamed, or injured area. The soft wave apparatus 36 may, for example, help relieve back and joint pain without the use of drugs.

[0037]   The soft wave apparatus 36 of the present invention may also be used in order to improve fuel economy in cars by wrapping the apparatus 36 around the fuel line. Along these same lines, the soft wave apparatus 26 may also be used to improve the efficiency of butane and propane systems.

[0038]   The soft wave apparatus 36 may be used to control calcium buildup in boilers, chillers, plumbing fixtures and equipment without chemical use.

[0039]   While not relying on any single mode of operation of the present invention, the soft wave apparatus 36 may use electromagnetic impulses to restructure minerals and water molecules. The flux field of the soft wave apparatus 36 may travel with the flow of the water for a better, longer and stronger treatment, delivering optimum results. As water flows through a magnetic field, the molecules align. The soft wave apparatus 36 may use a pulsing electromagnetic field (PEMF) to align the molecules in a uniform directional field. Water may regain its solvency and may not allow minerals to form hard crystals of scale. The electromagnetic field generated by the soft wave apparatus 36 may move with the flow of the water, aligning the molecules and separating out the calcium. By treating the water instead of the calcium, the water may not bond with the calcium. The calcium may crystallize

starving bacteria and not allow the calcium to bond in pipes, on fixtures in water heaters, or on glass or tile.

## EXAMPLES

### Example 1

#### Reduction of Nitrates/Nitrites

[0040]   A manufacturer of health foods in Central Texas has a water softener and a reverse osmosis installed in their plant to remove hardness and nitrate/nitrites in the water. Nitrates/nitrites tested 1.0 ppm. A soft wave apparatus, according to an embodiment of the present invention, was installed to reduce salt usage and improve the efficiency of the reverse osmosis. The nitrate/nitrite levels tested zero after the installation of the soft wave apparatus.

### Example 2

#### Water Discoloration from Vegetation

[0041]   Last summer on Father's Day weekend, a pool that had been opened for 6-7 weeks had cloudy water that the pool service company could not clear up. The pool company had closed/covered the pool (for winterizing) with a large amount of leaves at the bottom. A soft wave apparatus, according to an embodiment of the present invention, was installed on the pool. The installation was as described above and the cloudy water cleared up by the very next day. It was also noticed that the usual negative effects (dry skin and hair, burning eyes and chlorine order) of the chlorine were not present. Days later, the pool clarity kept increasing. The pool was about 35,000 gallons and included sand filtration and a gas heater. The pool water temperature is normally kept around 85 degrees.

### Example 3

#### Tannins Removed from Water

[0042]   A home with a Culligan softener and a pool, all on well water, had a complaint of yellow water (lab analysis showed presence of tannins). Three soft wave apparatus, according to an embodiment of the present invention, were installed one on the well, one on the pool and one inline before the softener. Lab tested 0 tannins and TDS (Total Dissolved Solids) dropped 300 ppm from 1000 pmm. Home owner took pictures of their crystal blue pool (first time clear in 8 yrs).

### Example 4

#### Water Softener Salt Reduction 5 Month Ongoing Test

[0043]   Two hotels next to each other had the same water source. Both had Culligan® water softeners and both were monitored weekly by Culligan. The water at both facilities was tested and monitored daily by the hotel's Director of Engineering. Softeners with a soft wave apparatus, according to an embodiment of the present invention, consistently tested 0 to 4 grains hard (depending on the time of the last regeneration).

[0044]   Cold side water, by-passed by the water softener, tested 16 grains hard. The use of the water softeners without the soft wave apparatus tested 7 to 10 grains hard on the hot side.

[0045]   The Head of House Keeping (unaware of the ongoing tests) was asked by Engineering to test the water at both hotels. At one hotel (with the installed soft wave apparatus), towels and linens were softer and whiter and it was reported that the water tasted better.

[0046]   Four months into the test, Engineering had House Keeping eliminate soap in the laundry and use only the bluing and bleach products. The hotel with the soft wave apparatus still had the whiter and softer linens.

### Example 5

#### Hotel Swimming Pool

[0047]   Chemicals used in the swimming pool were monitored and dispensed electronically. Chlorine usage was 15 gallons per day prior to the installation of the soft wave apparatus, according to an embodiment of the present invention.

[0048]   One week after installation of the soft wave apparatus, chlorine usage was 5 gallons per day while still maintaining the required 4.0 PPM to 5.0 PPM chlorine. Two weeks after install, the calcium ring on the pool tile removed easily with a non-scratch sponge.

### Example 6

#### Water Softener Salt Reduction

[0049]   A water softener (Kenmore, 1 cube) was installed on a home in Fort Mojave in May 2009. At the same time a new water heater and a soft wave apparatus, according to an embodiment of the present invention, was installed. Initially, water was 75 grains hard. There were 8 family members. The water softener's salt setting was set for 30 grains hard (57% usage reduction). In February, the water was tested for hardness. Raw water tested at 73 grains hard. Treated water was tested at 4 grains hard. At time of test, water softener had not regenerated for 1½ days.

[0050]   The water heater was drained for the first time since installation (10 months) and the water was flushing clean with no residue.

### Example 7

#### Water Softener Salt Reduction

[0051]   Hardness was set at 50 grains hard. The home still had problems with calcium build up. The settings were changed to 10 grains hard, and the soft wave apparatus, according to an embodiment of the present invention, was installed. No more calcium buildup was observed and the existing calcium dissolved naturally.

[0052]   It should be understood, of course, that the foregoing relates to exemplary embodiments of the invention and that modifications may be made without departing from the spirit and scope of the invention as set forth in the following claims.

We claim:

1. An apparatus comprising:

a plurality of rods;

a non-conductive coating on at least a portion of each of the rods;

a wire wrapped around the non-conductive coating of each of the rods;

4

one end of the wire of a first rod connected to a first line of a DC power supply;

a second end of the wire of a first rod connected to a wire end of an adjacent rod;

one end of the wire of the last rod connected to a second line of the DC power supply;

a second end of the wire of the last rod connected to a wire end of an adjacent rod; and

each of the plurality of rods between the first rod and the last rod having first and second ends of wire connected to wire ends of each adjacent rod.

**2**. The apparatus of claim **1**, wherein the rods are from about 4 to about 10 inches long and have a diameter from about ⅛ to about ¼ inch.

**3**. The apparatus of claim **1**, wherein the non-conductive coating covers each of the rods except for about ½ inch at each end of each rod.

**4**. The apparatus of claim **1**, wherein the wire is a copper wire.

**5**. The apparatus of claim **1**, wherein the wire is wrapped at least once from one end of the non-conductive coating to the other end of the non-conductive coating and back to the original end.

**6**. The apparatus of claim **5**, wherein an inner wire end of one rod attaches to an exterior wire end of an adjacent rod.

**7**. The apparatus of claim **1**, wherein the DC power supply outputs from about 5 to about 24 volts DC at from about 1 to about 3 amperes.

**8**. The apparatus of claim **1**, further comprising a spacer strip connecting ends of each of the plurality of rods.

**9**. The apparatus of claim **1**, wherein the plurality of rods are disposed substantially parallel to each other.

**10**. The apparatus of claim **1**, further comprising a flexible housing containing the plurality of rods.

**11**. The apparatus of claim **1**, wherein the plurality of rods includes from about 5 to about 20 rods.

**12**. A method for generating a multi-vibrational electromagnetic field, the method comprising moving current through a plurality of copper wire coils, each of the copper wire coils wrapped around a rod, each of the rods disposed substantially parallel to each other.

**13**. The method of claim **12**, further comprising:

encasing the plurality of rods in a flexible housing; and

wrapping the housing around a pipe.

**14**. The method of claim **12**, further comprising placing the generated electromagnetic field near a person or animal in need thereof in order to treat inflammation or pain.

**15**. The method of claim **12**, further comprising:

encasing the plurality of rods in a flexible housing; and

wrapping the housing around a fuel line.

**16**. The method of claim **12**, further comprising:

wrapping the wire at least once from one end of the non-conductive coating to the other end of the non-conductive coating and back to the original end; and

attaching an inner wire end of one rod to an exterior wire end of an adjacent rod.

**17**. An electromagnetic apparatus delivering multi-vibrational fields, the electromagnetic apparatus comprising:

a plurality of spaced apart elongated rods with opposing ends, the rods partially covered with a non-conductive coating leaving the opposing ends of the rods uncovered;

copper wire wrapped around each of the plurality of elongated rods, over the non-conductive coating, forming a plurality of copper coils connected in sequence to a power supply;

a spacer strip attached to each end of the elongated rods; and

a flexible housing for containing the plurality of copper coils.

**18**. The electromagnetic apparatus of claim **17**, wherein:

the wire is wrapped at least once from one end of the non-conductive coating to the other end of the non-conductive coating and back to the original end; and

an inner wire end of one rod attaches to an exterior wire end of an adjacent rod.

\* \* \* \* \*

Patent Application Publication     Nov. 7, 2013   Sheet 1 of 8        US 2013/0293327 A1



FIG. 1



FIG. 2

FIG. 3



FIG. 4



FIG. 5



FIG. 6



FIG. 7



FIG. 10



FIG. 11



FIG. 12

EXHIBIT 2

# IN THE UNITED STATES PATENT OFFICE

| | | | | |
|---|---|---|---|---|
| Inventor: | Wilson et al. | | Docket No. | 9123B |
| Patent No. | 8,477,003 | | Issued: | July 2, 2013 |
| Serial No. | 13/262,227 | | Filing Date: | March 29, 2010 |
| For: | APPARATUS FOR GENERATING AMULTI-VIBRATIONAL FIELD | | | |

## ASSIGNMENT

   **WHEREAS,** I/we, the undersigned,   Gary Dean Wilson and Michael Dean Brown own rights to the above identified patent (hereinafter "Patent" or "Invention").

   **WHEREAS,**   America Greener Technologies Inc. (hereinafter "Company" or "Assignee"), an Arizona Corporation, having a principal place of business at 254 S. Mulberry ST #113  Mesa, Arizona 85202 is desirous of acquiring certain rights thereunder;

   **NOW, THEREFORE,** for one dollar and other good and valuable considerations, the receipt of all of which is hereby acknowledged, the undersigned:

   Hereby sell, assign, and transfer unto said Company the entire right, title and interest in and throughout the United States of America (including its possessions and dependencies), and all countries foreign thereto, in and to said  Invention and any and all patents (including reissues and extensions thereof), of any country, which have been or may be granted on said Invention or any part thereof, or any divisional, substitute, continuation-in-whole or in-part, renewal, reissue or other patent application based thereon, or based upon said invention, together with the right in said Company to apply for any such patent in its own name in all countries of the world where such is permissible by law, and the right to claim the benefit of the priority right provided by the International Convention of 1883, as amended to date, and any other such priority right; TO BE HELD AND ENJOYED by said Company, its successors and assigns, to the full ends of the respective terms for which said patents or any of them have been or may be granted as fully and entirely as the same would have been held and enjoyed by the undersigned had no sale and assignment of said interest been made;

   Authorize and request the Commissioner of Patents of the United States of America to issue any and all United States Patents which may be granted upon said United States Applications or any of them, or upon said invention or any part thereof, to said Company;

   Agree, for the undersigned and for the heirs and legal representatives of the undersigned, to execute without further consideration any further lawful documents and any further assurances, and any divisional, continuation-in-whole or in-part, substitute, renewal, reissue, or other applications for patents of any country that

1



might be deemed necessary by said assignee fully to secure to said assignee its interest as aforesaid in and to said invention or any part thereof, and in and to said several patents or any of them.

Covenant, for the undersigned and for the legal representatives of the undersigned, and agree with said Company its successors and assigns, that no right of license to make, use or sell said invention has been or will be granted by the undersigned to anyone.

IN WITNESS WHEREOF, I have unto set my hand and seal on the date indicated by my signature.

INVENTORS:

Mr. Gary Dean Wilson

9-10-2014

Date

Mr. Michael Dean Brown

9-10-2014

Date

COMPANY (America Greener Technologies Corporation)

Mr. Michael Boyko  (CEO)

9/10/2014

Date

2

EXHIBIT 3

(Page 1 of 3)

## MUTUAL NON-DISCLOSURE AND CONFIDENTIALITY AGREEMENT

This Non-Disclosure and Confidentiality Agreement ("Agreement") is made as of this ___3rd___ day of _November_ 2014 by and between America Greener Technologies Inc, 254 S. Mulberry St., Suite #113, Mesa, Arizona 85202   (" The Principal hereafter referred to as AGT") and ___Brian Barker___
("Customer or Consultant or Employee")

with its office located at ___254 S. Mulberry St. Suite 113 Mesa, Az 85202___

WHEREAS, the parties propose certain valuable and proprietary business, technical and financial information and documentation relating to their respective current and future business that are not generally available to the public, and which the parties desire to protect against disclosure or competitive use; and

WHEREAS, the parties desire to exchange Confidential Information as that term is defined below for the purpose of exploring a business relationship regarding AGT's technologies, products and services.

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained herein, the parties agree as follows:

1. "Confidential Information" shall mean all information (in written, oral or electronic form) that is disclosed between the parties and that is conspicuously marked by the disclosing party (the "Disclosing Party") as being confidential, or should have been reasonably understood by the receiving party (the "Receiving Party") to be confidential.

Confidential Information shall include , without limitation, business, financial, accounting and marketing information, analyses, forecasts, predictions or projections, as well as technical information, software, demonstration programmes, routines, computer systems, techniques, documentation, designs, procedures, formulas, inventions, improvements, concepts, records files, memoranda, reports, drawings, plans, price lists, customer lists or other account information, trade secrets, know-how, and/or other intellectual property. In addition, the existence and terms of this Agreement, and the fact and substance of all discussions or correspondence relating to this |Agreement or the Project, including all identification by name or identifiable description of the parties, shall be deemed Confidential Information of both parties and shall not be disclosed without the consent of the other party.

Rev. 10-2014

Confidential Information shall not include information that (a) is or becomes public domain through no action on the part of the Receiving Party;  (b) is lawfully obtained from any source other than the disclosing party (the "Disclosing Party"), without an obligation to keep it confidential: (c) is previously known to the Receiving Party without an obligation to keep it confidential, as can be substantiated by written records; (d) is expressly released in writing from the obligations of confidentiality imposed by this Agreement by the Disclosing Party; (e) is required to be disclosed pursuant to any applicable law, regulation, judicial or administrative order or decree, or request by other regulatory organisation having the authority pursuant to the law; provided, however, that the Receiving Party shall first have given prior notice to the Disclosing Party and made a reasonable effort to obtain a protective order requiring that the Confidential Information not be disclosed; and further provided that the Receiving Party shall use reasonable efforts to minimize such disclosure and to obtain an assurance that the recipient shall accord confidential treatment to the Confidential Information; or  (f) is independently developed by the Receiving Party. Any Party asserting that information is not Confidential Information by virtue of any of (a) through (f) hereof shall have the burden of proof on such issue.

2. In consideration of the disclosure of Confidential Information by the Disclosing Party, the Receiving Party shall:

  a) use the Confidential Information received solely in connection with and for the furtherance of the Project, and not for any other purpose whatsoever without the prior express written consent of the Disclosing Party, and shall limit access to such Confidential Information solely to its employees with a need to know for such purpose, and shall advise such employees of their confidentiality obligations hereunder; and

  b) take strict precautions to maintain the confidentiality of the Confidential Information for a period of five (5) years from the date of receipt or for a period of time as may be set forth in a related agreement or amendment to this Agreement, whichever is longer, and shall take appropriate action, by instruction, agreement or otherwise with any person permitted access to the Confidential Information received, to ensure that the Receiving Party will be able to satisfy its obligations under this Agreement; and

  c) refrain from copying or disclosing the Confidential Information received, except as expressly permitted in this Agreement; and

  d) upon the written request of the Disclosing Party, promptly destroy, and certify to the Disclosing Party as destroyed, or return any and all copies on any media containing such Confidential Information.

3.      Unauthorised disclosure or use of Confidential Information may give rise to irreparable injury, which may not be adequately compensated by damages. In the event of a breach or threatened breach of this Agreement, the Disclosing Party shall be entitled to a preliminary injunction and a temporary restraining order restraining the Receiving Party from using or disclosing the Confidential Information or such other equitable relief as may be necessary to protect the interests of the Disclosing Party. Nothing herein shall be construed as prohibiting the Disclosing Party from pursuing any other remedy available for such breach or threatened breach.

Rev. 10-2014

(Page 3 of 3)

This Agreement constitutes the entire agreement between the parties and supersedes any prior or contemporaneous oral or written representations regarding the subject matter hereof. Nothing contained in this Agreement shall be construed as granting or conferring any rights by license or otherwise in any Confidential Information disclosed, or under any trademark, patent, trade secret, copyright, or any other intellectual property right of either party. Except for the obligations of use and confidentiality imposed herein, no obligation of any kind is assumed or implied against either party by virtue of the party's meetings or conversations with respect to the subject matter stated above or with respect to whatever Confidential Information is exchanged. Each party further acknowledges that this Agreement and any meetings and communications of the parties relating to the same subject matter, including the exchange of Confidential Information shall not: (a) constitute an offer, request or contract with the other to engage in any research, development or other work; (b) constitute an offer, request or contract involving a buyer-seller relationship, venture, teaming or partnership relationship between the parties; or (c) impair or restrict either party's right to make, procure or market any products or services now or in the future, which may be similar to or competitive with those offered by the other party, or which are the subject matter of this Agreement, so long as that party's obligations of confidentiality under this Agreement are not breached. The parties expressly agree that any money, expenses or losses expended or incurred by each party in preparation for, or as a result of this Agreement or the parties' meetings and communications, is at each party's sole cost and expense.

4. This Agreement may not be modified except by a written instrument signed by the parties hereto.

5       PRINCIPAL Makes no representation or warranty, express or implied, as to the accuracy or completeness of any Confidential Information, and expressly disclaims any and all responsibility and liability to for all conclusions derived from the Confidential Information of PRINCIPAL.

6.      This Agreement shall be binding on the parties, their successors and assigns, and shall be governed by the laws of United States of America.

7.      This Agreement shall remain effective with respect to any Confidential Information which is disclosed hereunder at any time within five (5) years from the date first stated above, or for a period of time as may be set forth in a related agreement or amendment to this Agreement, whichever is longer, and shall be subject to the provisions of Section 2 hereinabove.

8.      Should any provision of this Agreement be held unenforceable, the remainder of this Agreement shall not be affected thereby.

PRINCIPAL                                        REPRESENTITIVE

America Greener Technologies Incorporated        Brian Barker
                                                 _____
                                                         (Full Name)
_____                   _____
Michael C. Boyko                                         (Signature)
President & CEO, Director
                                                 _____
                                                           (Title)

                                                                    Rev. 10-2014