**WO**                    NOT FOR PUBLICATION

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| America Greener Technologies Incorporated, *et al.*, | No. CV-15-02491-PHX-JJT |
| Plaintiffs, | **ORDER** **REDACTED** |
| v. | |
| Enhanced Life Water Solutions LLC, *et al.*, | |
| Defendants. | |

At issue is Plaintiffs' Application for Temporary Restraining Order and Preliminary Injunction (Doc. 2, hereinafter "Motion"). Plaintiffs, America Greener Technologies, Inc., American Greener Technologies Corporation and AGT Softwave, Inc. (collectively, "Plaintiffs"), filed this lawsuit and their Motion on December 9, 2015. (Doc. 1, Compl.; Mot.) In Plaintiffs' Motion, they request that the Court issue a temporary restraining order ("TRO") and preliminary injunction to "enjoin Defendants from their current actions which include infringement of Plaintiffs' patent rights, misappropriation of Plaintiffs' trade secrets, violation of the Confidentiality clauses of their employment agreement and the unjust enrichment of Defendants." (Mot. at 1–2.) The Court held a preliminary injunction hearing on January 28, 2016 (*see* Doc. 82), at which Plaintiffs' counsel stated the motion for a preliminary injunction would be limited to the patent infringement and violation of the confidentiality and nondisclosure agreement claims (Doc. 85, Tr. at 14). In advance of the hearing, the parties filed Bench Briefs (Doc. 84, Pls.' Bench Br., filed under seal; Doc. 81, Defs.' Bench Br.), and the

parties also filed Closing Briefs after the hearing (Doc. 103, Pls.' Closing Br., filed under seal; Doc. 100, Defs.' Closing Br.). The Court has considered the briefing filed in this matter and evidence presented at the preliminary injunction hearing and, for the reasons set forth below, denies Plaintiffs' Application for Temporary Restraining Order and Preliminary Injunction.

## I.     BACKGROUND

### A.     Inventors and Assignment of the Patent

Plaintiffs are a conglomerate that, among other things, provides water treatment services. Defendant Gary Wilson and Michael Brown are the inventors of the patent entitled "Apparatus for Generating a Multi-Vibrational Field," registered with the United States Patent and Trademark Office ("PTO") as Patent No. 8,477,003 ("Patent '003") dated July 2, 2013. (Defs.' Bench Br., Ex. 1, Patent.) Plaintiffs sought to acquire Patent '003 and the technology, clients, and other assets of Soft Wave Innovations, Inc. ("SWI"), of which Mr. Wilson was CEO and principal shareholder. (*See* Tr. at 27–31.) On September 10, 2014, Mr. Wilson and Mr. Brown executed an Assignment Agreement for Patent '003 to American Greener Technologies Corporation, represented by CEO Michael Boyko (Defs.' Bench Br., Ex. 3, Assignment Agreement), and the Assignment was recorded with the PTO on September 15, 2014 (Defs.' Bench Br., Ex. 4). Plaintiffs and SWI continued to engage in business negotiations and entered into other agreements regarding the assignment of Patent '003, royalty payments to Mr. Wilson and others, and the sale of SWI and its assets to Plaintiffs. The Court only specifically addresses the contracts relevant to its determination of the issues currently before it at this preliminary injunction stage.

A series of actions occurred in the fall of 2014, further uniting the individual Defendants and Plaintiffs. On October 31, 2014, Plaintiffs entered into an Asset Purchase Agreement ("APA") with SWI, under which Plaintiffs purchased SWI's customer contracts. (Defs.' Bench Br., Ex. 11, APA.) Plaintiffs also hired individual Defendants Gary Wilson, Brian Barker, Bruce Baker, and Stephen Clausi (Tr. at 46, 142, 144, 154),

and they each signed a "Mutual Non-Disclosure and Confidentiality Agreement"[1] with Plaintiffs. (Defs.' Bench Br., Exs. 7, 8, 9, 10, NDAs.)

Plaintiffs fired all four individual Defendants on May 15, 2015. (Pls.' Hr'g Ex. 25.) Defendants later formed and began providing water treatment services through the companies Defendant Enhanced Life Water Solutions, LLC, a/k/a EL+ Solutions ("ELWS") and True Water Services, and they provided clients with the apparatus (the "Accused Device") that Plaintiffs claim infringes on Patent '003. (*See* Tr. at 154; Defs.' Closing Br. at 10–11.)

## B.    Patent '003

Patent '003 teaches an electromagnetic water treatment apparatus that delivers multi-vibrational electromagnetic fields ("MVEM"), which are applied to water flowing through a waterway. (Patent at 2.) MVEM fields are independent but may work simultaneously and can be used for various applications including eliminating calcium buildup in pipes, reducing soap usage in laundry, and reducing chlorine use in pools. (Patent at 2.) Patent '003 has 17 claims including claim 1, which in part claims "an apparatus comprising: a plurality of rods" and "a flexible spacer strip connecting ends of each of the plurality of rods," and claim 9, which claims "[t]he apparatus of claim 1, further comprising a flexible housing containing the plurality of rods." (Patent at 13–14.) Claim 11 states "[a] method for generating a multi-vibrational electromagnetic field, the method comprising moving current through a plurality of copper wire coils, each of the copper wire coils wrapped around a rod, each of the rods being connected to a flexible spacer strip, and each of the rods being disposed substantially parallel to each other." (Patent at 14.) Claim 12 provides, "[t]he method of claim 11, further comprising: encasing the plurality of rods in a flexible housing; and wrapping the housing around a pipe." (Patent at 14.) Patent '003 includes drawings of the claims and further detail.

---

[1] The Court refers to all four Mutual Non-Disclosure Agreements, which are exactly the same except as to the parties, collectively as the "NDAs."

### C.     The Preliminary Injunction Hearing

#### 1.     Development and Sale of the Accused Device

Mr. Wilson, as co-inventor of Patent '003, built the original units with SWI, which Plaintiffs later acquired. (Tr. at 138.) Mr. Wilson, now acting as a consultant of ELWS, also builds the Accused Devices, for which there is a pending patent application listing him as the sole inventor. (Tr. at 140–41, 147; Doc. 86, Sealed Tr. at 5–6.) Mr. Wilson stated devices built under his new patent compete with Plaintiffs but that he did not disclose to Plaintiffs he was building his own units or that he filed a patent application. (Tr. at 141, 145–46.) He did not recall exactly when he developed the idea for the Accused Device, but he filed the patent application after signing the NDA, Letter of Intent, and APA with Plaintiffs. (Tr. at 140–44.) He stated he most likely filed the patent application before Plaintiffs terminated him and built a few Accused Devices prior to his termination. (Sealed Tr. at 14.) Mr. Wilson stated he did not use any of his knowledge from Patent '003 in making the Accused Device. (Sealed Tr. at 7.) ███████████ █████████████████████████████████████████████████████████████████

Bruce Barker's company, True Water Services, conducts the sales and services for ELWS of the Accused Device, and Mr. Clausi is a subcontractor for True Water Services responsible for service on the devices and service reports. (Tr. at 153, 170–71.) After Plaintiffs fired him, Bruce Barker, via True Water Services, entered into contractual relationships with Plaintiffs' clients. (*See* Tr. at 155, 157, 160–61.)

#### 2.     Marketing Materials, Customers and Service Contracts

Russell Corrigan, Director of Operations and custodian of records for America Greener Technologies, Inc. and AGT Softwave (Tr. at 24) testified that he believed Defendants had taken several of Plaintiffs' marketing materials. Mr. Corrigan testified that Plaintiffs' investor pitch deck was available to the individual Defendants while they were employees of Plaintiffs and the document was marked as confidential. (Tr. at 68–69.) After viewing ELWS's promotional video that included a Powerpoint slide that showed ELWS's customers, Mr. Corrigan stated he believed the slide was taken from

Plaintiffs' marketing files, but it was not clear whether he believed the slide was taken from the pitch deck marked confidential (Pls. Hr'g Ex. 34) or a similar client list slide not marked as confidential (Pls. Hr'g Ex. 33). (Tr. at 67–69.) Bruce Barker, Defendant and former employee of Plaintiffs, testified that three of the entities listed on the ELWS customer list slide in their promotional video were not ELWS customers, and he did not know why they appeared on the slide. (Tr. at 175–76.)

In 2015, Plaintiffs began to receive termination letters from their then-current clients who were previously SWI's clients and whose contracts Plaintiffs had acquired through the APA. (*See* Tr. at 69–70, 87–92.) Plaintiffs received termination letters from the following six clients: the Church of Jesus Christ of Latter-day Saints on June 23, 2015 (Tr. at 70, Pls.' Hr'g Ex. 35), True Leaf Farms on August 27, 2015 (Tr. at 71, Pls.' Hr'g Ex. 38), Growers Ice Co. on September 24, 2015 (Tr. at 73, Pls.' Hr'g Ex. 40), Western Precooling on September 28, 2015 (Tr. at 76, Pls.' Hr'g Ex. 44), City of Thousand Oaks on September 28, 2015 (Tr. at 77, Pls.' Hr'g Ex. 45), and BC Systems, Inc.[2] on January 19, 2016 (Tr. at 82–83, Pls.' Hr'g Ex. 48). (*See also* Tr. at 175–76.) Of these clients, Western Precooling made up the largest source of revenue and was the "backbone of [Plaintiffs'] customers." (Tr. at 76.) All but one of the clients who submitted termination letters to Plaintiffs were clients of ELWS/True Water Services at the time of the hearing. (Tr. at 175–78.)

Bruce Barker also testified that Crown Cooling, a client that was part of the APA, was Defendants' client at the time of the hearing. (Tr. at 176–77.) With regard to another client, Nucor Steel, Mr. Corrigan testified he believed that Nucor continued to be Plaintiffs' client (Tr. at 58, 66), but Bruce Barker testified that Nucor was ELWS's client and Plaintiffs' equipment had been taken off Nucor's plant (Tr. at 175). In addition, in January 2016, one of Plaintiffs' customers, Dole Foods, contacted Plaintiffs requesting more favorable contract terms, which Mr. Corrigan believes was in response to

---

[2] BC Systems, Inc. was not a SWI client transferred to Plaintiffs, as evidenced in the APA. (*See* APA at 23–24.) It is unclear whether BC Systems, Inc. was a client of ELWS/True Water Services at the time of the hearing.

Defendants' business proposals to Dole. (Tr. at 83–84.) After reaching out to the customers from whom Plaintiffs received notices of termination, Plaintiffs learned that clients were receiving the same type of services from a competing company owned, at least in part, by the four individual Defendants. (Tr. at 78–79.)

Bruce Barker also testified regarding the actions he took with Plaintiffs' clients referenced above. He stated that Dole initially approached him, and only then did he engage with the company. (Tr. at 175.) He also began a business relationship with True Leaf Farms around June 15, 2015 and thereafter removed Plaintiffs' units, replacing them with Accused Devices without Plaintiffs' knowledge or permission. (Tr. at 155, 157.) Bruce Barker provided Growers Ice with a proposal for the same services Plaintiffs were providing in July 2015 (Pls.' Hr'g Ex. 50; Tr. at 160–61), and he engaged in business negotiations with Western Precooling prior to the termination date of its contract with Plaintiffs (Tr. at 166).

When SWI and Plaintiffs entered into the APA, Plaintiffs took over the SWI client contracts without making any changes to the contracts. (Tr. at 181–82.) With regard to previous knowledge of the terms and provisions of Plaintiffs' client contracts, Bruce Barker stated he was aware of the provisions from his previous work with SWI and SWI's client contracts entered into in 2012. (Tr. at 181.) He stated he possessed this knowledge prior to when he signed the NDA, and SWI never instructed him to keep information related to the client contracts confidential. (Tr. at 181.) Also, as a former employee of Plaintiffs, Bruce Barker testified he did not believe Plaintiffs' contracts with customers were confidential. (Tr. at 151.)

### 3.    The APA, NDAs and Confidentiality

At the hearing, the parties disputed whether the APA and NDAs included provisions that would have made the individual Defendants' actions with regard to marketing materials, client lists, and other information a breach of those contracts. As for the APA, it included no provision requiring SWI to keep former client identities

- 6 -

confidential after the APA and/or sale was concluded, and it also did not include a non-compete provision. (Tr. at 92–93.)

With regard to the confidentiality of various materials, Plaintiffs' representative, Mr. Corrigan, stated that none of the client lists, service contracts, or accounting records disclosed as Plaintiffs' hearing Exhibits 3 and 4, and Exhibit 1.1 to the APA, were marked as confidential. (Tr. at 94–96.) He was also not aware of any confidentiality agreements between SWI and the individual Defendants. (Tr. at 94–96.) He further stated he was aware that the individual Defendants and SWI attended various trade shows, where they displayed the same list of clients that Plaintiffs had acquired. (Tr. at 96–99.) Mr. Corrigan stated that because of this public disclosure and the individual Defendants' past relationships with the clients, there was no basis on which Defendants should have reasonably understood that the client information should remain confidential. (Tr. at 98–99.) He also stated that, for those same reasons, the identity of customers could not be considered confidential. (Tr. at 98–99.)

### 4.     The Expert Report, Inspection of the Accused Device and Expert Testimony

Prior to the hearing, the parties agreed upon and retained a neutral expert witness, Christopher Nicklaw, an electrical engineer with over 35 years of experience (Pls.' Hr'g Ex. 112), to conduct an inspection of the Accused Device.[3] (*See* Doc. 28.) Prior to the inspection, both parties exchanged and provided Mr. Nicklaw with their respective proposed claim constructions and list of questions for Mr. Nicklaw to address in his report. (*See* Doc. 41.) On January 7, 2016, Mr. Nicklaw heard presentations from the parties and inspected the Accused Device at one of Defendants' clients' locations in Yuma, Arizona. (*See* Docs. 31, 41, 62 at 3.) At the hearing, the parties stipulated that Mr. Nicklaw is a qualified expert in the art, and the Court, Bruce Barker, and Mr. Nicklaw together examined the Accused Device. (Sealed Tr. at 24, 28–29.)

---

[3] The Court issued an Order on January 5, 2016 setting forth the parameters of Mr. Nicklaw's inspection and evaluates his opinion and report as they conform to those parameters. (*See* Doc. 41.)

In his Expert Report, Mr. Nicklaw examined and compared a device owned and utilized by Plaintiffs and the Accused Device.[4] (Docs. 62, 73, Expert Report,[5] filed under seal at 14, 17.) He stated that both Plaintiffs' device under Patent '003 and the Accused Device are comprised of inductive coils that are sleeved onto a water pipe, and that a voltage signal unit, electrically connected to the inductive coil, is used to generate an electromagnetic field to treat the water flowing through the pipe. (Expert Report at 14.) Mr. Nicklaw opined that the construction of coils in Plaintiffs' device under Patent '003 is different than that in the Accused Device. (Expert Report at 17.) Mr. Nicklaw also provided comments within Defendants' proposed claim construction chart, but it is not clear whether his comments reflect his comparison of the Patent '003 claims or Plaintiffs' device that he inspected with the Accused Device.[6] (*See* Expert Report at 33–60.)

---

[4] For the infringement analysis, the relevant comparison is between the '003 Patent and the Accused Device, not between a device owned by Plaintiffs that is one embodiment of Patent '003.

[5] References to page numbers of the Expert Report refer to pages in Doc. 62.

[6] Mr. Nicklaw testified that he considered his task "as the claims of construction against the patent . . . and against the patent history," and that he examined units owned by Plaintiffs and Defendants. (Sealed Tr. at 34.) In some parts of his testimony, it is not entirely clear whether Mr. Nicklaw is discussing his comparison of the Accused Device to the Patent '003 claims or, rather, to Plaintiffs' device, a device the parties did not dispute is one embodiment of Patent '003. (*See* Sealed Tr. at 34.) Again, the Court did not consider Mr. Nicklaw's opinions that went beyond his defined role to provide an explanation of the technology and compare Patent '003 and the Accused Device.



[redacted]

[redacted]

## II.   LEGAL STANDARD

In order to obtain a preliminary injunction, Plaintiffs must show that "(1) [they are] likely to succeed on the merits, (2) [they are] likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in [their] favor, and (4) an injunction is in the public interest." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 9 (2008)). The Ninth Circuit, employing a sliding scale analysis, has also stated "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1078 (9th Cir. 2013) *cert. denied*, 134 S. Ct. 2877 (2014) (quoting *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1132 (9th Cir. 2011)). It is under this standard that the Court evaluates Plaintiffs' patent infringement claim and their claim for violation of confidentiality and the non-disclosure agreements.

## III.   ANALYSIS

As a threshold matter, the Court's decision herein is based on the limited information before it at the preliminary injunction stage. The Court has reviewed the parties' briefing, the Expert Report, and the evidence presented at the hearing, but the Court does not have the benefit of the parties' full discovery, leaving it with incomplete information. The Court "remain[s] mindful that all findings of fact and conclusions of law at the preliminary injunction stage are subject to change upon the ultimate trial on the merits." *Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002) (internal quotations omitted).

The Court does not consider Plaintiffs' argument regarding their rights under a "Secondary Assignment," which they argue assigned to them nearly all of the water

treatment technology Mr. Wilson developed, rather than just Patent '003. (*See* Pls.' Hr'g Ex. 11; Tr. at 39–41.) Plaintiffs first raised this theory at the preliminary injunction hearing – they did not reference the Secondary Assignment in their prior briefing. (*See* Docs. 1, 50.) Citing to Federal Rule of Civil Procedure 15, Defendants properly objected to Plaintiffs' introduction of the Secondary Assignment. (Tr. at 18–19.) Rule 15 provides that leave to amend a complaint should be freely granted "when justice so requires." Fed. R. Civ. P. 15(a)(2). "The power to grant leave to amend, however, is entrusted to the discretion of the district court, which 'determines the propriety of a motion to amend by ascertaining the presence of any of four factors: bad faith, undue delay, prejudice to the opposing party, and/or futility.'" *Serra v. Lappin*, 600 F.3d 1191, 1200 (9th Cir. 2010) (quoting *William O. Gilley Enters. v. Atl. Richfield Co.*, 588 F.3d 659, 669 n.8 (9th Cir. 2009)). The Court finds that Plaintiffs are not entitled to amend because, by not raising the Second Assignment theory until the preliminary injunction hearing, Defendants were prejudiced by the lack of notice of the theory. In addition, the Court did not have notice of such theory. Accordingly, because of Plaintiffs' delay and the resulting prejudice to Defendants, the Court, in its discretion, will not consider the Secondary Assignment argument at this time. Plaintiffs may be able to later amend their Complaint to add this theory, but the Court does not consider it in deciding the preliminary injunction motion.

## A. Patent Infringement

Plaintiffs argue that the Accused Device infringes on Patent '003 because it is substantially similar to Patent '003. (Pls.' Closing Br. at 10.) The Patent Act authorizes district courts to grant injunctions to prevent the infringement of patent rights, but the owner of a valid and infringed patent is not entitled to an injunction as a matter of right. *See* 35 U.S.C. § 283. The four-factor *Winter* test applies to disputes arising under the Patent Act. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 390 (2006). A district court has the discretion to grant an injunction "in accordance with the principles of equity . . . on such terms as the court deems reasonable." *See* 35 U.S.C. § 283; *see also eBay Inc.*, 547 U.S. at 391. The Supreme Court and the Federal Circuit have cautioned that "a

1    preliminary injunction is a drastic and extraordinary remedy that is not to be routinely

2    granted." *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993); *see*

3    *Munaf v. Geren*, 553 U.S. 674, 689 (2008). A preliminary injunction "should not be

4    granted unless the movant, *by a clear showing*, carries the burden of persuasion."

5    *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

### 1.    Likelihood of Success on the Merits

7           In order to obtain a preliminary injunction, Plaintiffs must first show they are

8    likely to succeed on the merits. *See Winter*, 555 U.S. at 9. Determining patent

9    infringement is a two-step process, wherein courts first construe the patent claims and

10   then determine whether every claim limitation, or its equivalent, is found in the accused

11   device. *Roche Palo Alto LLC v. Apotex, Inc.*, 531 F.3d 1372, 1377 (Fed. Cir. 2008). A

12   party can allege infringement literally or under the doctrine of equivalents. *Frank's*

13   *Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1378–79

14   (Fed. Cir. 2004). "[L]iteral infringement requires that each and every limitation set forth

15   in a claim appear in an accused product." *Id.* at 1378. Under the doctrine of equivalents,

16   "a product or process that does not literally infringe upon the express terms of a patent

17   claim may nonetheless be found to infringe if there is 'equivalence' between the elements

18   of the accused product or process and the claimed elements of the patented invention."

19   *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997) (citing *Graver*

20   *Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 609 (1950)).

21          Here, based on Plaintiffs' briefing (*see* Pls.' Closing Br. at 10) and the parties'

22   respective claim constructions (*see* Defs.' Bench Br., Exs. 16, 17), Plaintiffs do not

23   appear to argue that the Accused Device literally infringes, and the parties have not raised

24   any dispute regarding the meaning and scope of claim terms. Rather, Plaintiffs allege that

25   the Accused Device is "substantially similar" to Patent '003 and "*almost all* of the

26   attributes of Patent '003 are present in the Accused Device." (Pls.' Closing Br. at 10)

27   (emphasis added.) Accordingly, the Court construes Plaintiffs' argument as one of

28

infringement under the doctrine of equivalents, not literal infringement, and focuses the analysis on whether Plaintiffs' device and the Patent '003 claims are substantially similar.

Plaintiffs argue that the difference in form/material between the Accused Device and the Patent '003 claims do not relieve Defendants of liability for patent infringement, and the minor modifications of the Accused Device fall under the doctrine of equivalents. (Pls.' Closing Br. at 10–13.) A patentee may invoke the doctrine of equivalents if the accused device performs "substantially the same function in substantially the same way to obtain the same result . . . even though [the devices] differ in name, form or shape." *Graver Tank*, 339 U.S. at 608. "What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case." *Id*. at 609. The Federal Circuit has also required that the patentee prove "insubstantial differences between the claimed and accused products or processes." *See Hilton Davis Chem. Co. v. Warner-Jenkinson Co.*, 62 F.3d 1512, 1521–22 (Fed. Cir.) *supplemented*, 64 F.3d 675 (Fed. Cir. 1995), *and rev'd on other grounds*, 520 U.S. 17 (1997), *and adhered to*, 114 F.3d 1161 (Fed. Cir. 1997). The Supreme Court has stated that the wording of these various standards "is less important than whether the test is probative of the essential inquiry: Does the accused product or process contain elements identical or equivalent to each claimed element of the patented invention?" *Warner-Jenkinson Co.*, 520 U.S. at 40. Two legal doctrines limit the determination of infringement under the doctrine of equivalents: the "all elements" rule and prosecution history estoppel. *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1013 (Fed. Cir. 2006).

### a.    All Elements Rule

"Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole." *Warner-Jenkinson Co.*, 520 U.S. at 29. "An analysis of the role played by each element in the context of the specific patent claim will thus inform the inquiry as to whether a substitute element

matches the function, way, and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element." *Id.*

Plaintiffs fail to apply the doctrine of equivalents to each individual element of the patent claim and only apply the doctrine to the invention as a whole. For example, Patent '003 claims as individual elements "a plurality of rods" and "flexible spacer strips." (Patent at 1, 13–14.) Plaintiffs do not argue or identify specific elements of the Accused Device as equivalent to these elements. ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████ The expert witness's testimony and report shows, however, that this structural difference is not insubstantial because it creates a difference between how a device under Patent '003 and the Accused Device would perform in the form of generating different MVEM fields, such that the two devices' functions are "substantially different." *See Graver Tank*, 339 U.S. at 608. ██ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████ the expert witness's testimony and report indicate that this difference in construction is not insubstantial because it changes the way the devices function and the resulting MVEM fields.

The Court finds Plaintiffs have failed to apply the doctrine of equivalents to the individual elements of each claim, and the expert witness's testimony and report show that even if the elements in the Accused Device could be construed as substitutes, Plaintiffs have produced no evidence to show they match the function, way, and result of the claimed elements in Patent '003. *See Warner-Jenkinson Co.*, 520 U.S. at 29; *Hilton Davis Chem. Co.*, 62 F.3d at 1521–22. Accordingly, Plaintiffs have not shown a likelihood of success on the merits of proving that the Accused Device infringes on Patent '003 under the doctrine of equivalents.

### b.     Prosecution History Estoppel

Plaintiffs are also subject to prosecution history estoppel, which "requires that the claims of a patent be interpreted in light of the proceedings in the PTO during the application process." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 733 (2002). Prosecution history estoppel precludes a patentee from claiming infringement and regaining, through litigation, subject matter or a purported equivalent alleged to infringe, when the patentee narrowed the claim in response to a PTO rejection. *Festo Corp*, 535 U.S. at 733–34 (quoting *Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1578 (Fed. Cir. 1997)). When the PTO rejects a patent application, it is because the patent examiner believes the original claim cannot be patented. *Id*. at 734. Although an amendment to a patent application is not an absolute bar to a later claim of infringement, when a patentee forgoes his or her appeal and submits an amended application, courts may interpret such as a concession that the invention as patented does not reach as far as the original claim. *Id*. In other words, estoppel arises when an amendment is made to secure the patent and the amendment narrows the patent's scope. *Id*. at 736.

The patentee has the burden to show that an amendment was not for purposes of patentability, and where no explanation is established "the court should presume that the patent application had a substantial reason related to patentability for including the limiting element added by amendment." *Id*. at 739–40 (quoting *Warner-Jenkinson*, 520 U.S. at 33.) The court should also "presume that the patentee surrendered all subject matter between the broader and narrower language." *Id.* at 740.

Plaintiffs, as the moving party asserting infringement of Patent '003, have the burden of proving the amendments made in response to the PTO's rejection of an earlier patent application do not surrender the alleged equivalents in question. *See id*.; (*see* Doc. 69, Patent History at 73–80.) In June 2012, the PTO rejected the patent application and all claims, 1-18, citing to 35 U.S.C. § 103(a) and finding that differences between existing patents – the "Godoy Patent" and the "White Patent" – and the patent application

would have been obvious to one of ordinary skill in the art at the time of the invention. (*See* Patent History at 74–79.) In response, the inventors traversed the rejections and submitted amendments. (*See* Patent History at 59–67.) The inventors added the following language to claim 1: "and a flexible spacer strip connecting ends of each of the plurality of rods" (Patent History at 59), and in describing the method for generating MVEM fields in claim 12, added the underlined language: "each of the rods <u>being connected to a flexible spacer strip, and each of the rods being</u> disposed substantially parallel to each other" (Patent History at 61). Claim 17 was also amended to include "flexible" describing the "spacer strip attached to each end of the elongated rods."[7] (Patent History at 62.)

Plaintiffs do not address prosecution history estoppel in their Bench or Closing Briefs, let alone provide an argument against the presumption that the patentee's amendment of the claims in response to the PTO's rejection is a general surrender of the territory between the original claim and the amended claim. *See Festo Corp.*, 535 U.S. at 740. The prosecution history indicates that the amendments were made to address the PTO's previous rejection on the basis of obviousness by including the more specific term "flexible spacer strip" and emphasizing the "plurality of rods." (*See* Patent History at 65.) In the remarks submitted to the PTO with the amendments, the patentee specifically addresses the "Godoy Patent," explaining that it fails to teach and would not have rendered obvious *amended* claim 1 "a flexible spacer strip connecting ends of each of the plurality of rods," and *amended* claims 12 and 17 also referencing the rods and flexible spacer strip. (*See* Patent History at 65–66.) Based on the record before the Court, where Plaintiffs have not addressed Defendants' prosecution history estoppel argument and the patent prosecution history shows the narrowing of claims, the Court cannot say Plaintiffs

---

[7] The Court notes that the patentee's remarks submitted with the amendments to the patent include the statement "any amendments herein that are not specifically made for the purpose of patentability are made for other purposes, such as clarification, and that no such changes shall be construed as limiting the scope of the claims or the application of the Doctrine of Equivalents." (Patent History at 66.) Without further detail by the patentees as to which amendments were not specifically made for patentability, and given only this boilerplate language, the Court does not find this statement material to its analysis.

have rebutted the presumption that estoppel applies and the alleged equivalents at issue have been surrendered. *See id.*

At this stage, because Plaintiffs have not shown they are likely to overcome the limitations of the all elements rule and prosecution history estoppel, they have failed to show a likelihood of success on the merits that the Accused Device infringes upon Patent '003 under the doctrine of equivalents.[8]

## B. Unauthorized Use of Plaintiffs' Confidential and Proprietary Information

Next, Plaintiffs argue that Defendants violated the NDAs and engaged in unauthorized use of Plaintiffs' confidential and proprietary information. (Pls.' Closing Br. at 13.) Specifically, Plaintiffs argue that Defendants' use of their marketing materials, service reports, and customer lists violated the NDAs. (Pls.' Closing Br. at 13–14.) Plaintiffs request that the Court enjoin Defendants' continued use of Plaintiffs' confidential and proprietary information. (Pls.' Closing Br. at 1.)

The Court notes that it has federal question jurisdiction over this matter where Plaintiffs bring claims that arise under the laws of the United States, including the patent infringement claim. *See* U.S.C. § 1331; 35 U.S.C. § 281. The Court has supplemental jurisdiction over Plaintiffs' Arizona state law claims because they also involve the alleged unlawful use of Plaintiffs' technology related to Patent '003 and related confidential and proprietary information. *See* 28 U.S.C. § 1367(a).[9] As such, Plaintiffs'

---

[8] Defendants argue that Plaintiffs have not established they are entitled to enforce Patent '003 because Plaintiffs' ownership is based on an assignment that is in turn contingent on a royalty agreement with Mr. Wilson, and Mr. Wilson has not yet received any royalty payments. (*See* Defs.' Closing Br. at 16 n.61.) Because the Court does not find likelihood of success on the merits for Plaintiffs' patent infringement claim at this point, it need not address Defendants' argument regarding Plaintiffs' ownership of Patent '003 at this time.

[9] Defendants admit that this Court has subject matter jurisdiction and personal jurisdiction over Defendants. (Doc. 97, Am. Compl. at 3.) Because the Court is applying basic contract principles, the choice of law was not critical to the Court's decision in this instance. The parties are advised they will need to demonstrate why Arizona law applies to any claims going forward. *See Barba v. Seung Heun Lee*, No. CV 09-1115-PHX-SRB, 2009 WL 8747368, at *9–10 (D. Ariz. Nov. 4, 2009) (citing Restatement (Second) of Conflict of Laws (1971) § 145(1) cmt. d).

1  state law claims are closely related to the patent infringement claim and form part of the

2  same case or controversy. *See id*.

3              **1.     Likelihood of Success on the Merits**

4        When interpreting contracts, such as the NDAs at issue here, courts seek to

5  ascertain and enforce the parties' intent. *ELM Ret. Ctr., LP v. Callaway*, 246 P.3d 938,

6  941 (Ariz. Ct. App. 2010). To determine intent, courts "look[s] to the plain meaning of

7  the words as viewed in the context of the contract as a whole." *Id*. at 941–42.

8        In the NDAs, "Confidential Information" is defined as "all information (in written,

9  oral or electronic form) that is disclosed between the parties and that is conspicuously

10 marked by the disclosing party . . . as being confidential, or should have been reasonably

11 understood by the receiving party . . . to be confidential." (NDAs at 1.) The NDAs further

12 state:

13        Confidential Information shall include, without limitation, business,
          financial, accounting and marketing information, analyses, forecasts,
14        predictions or projections, as well as technical information, software,
          demonstration programmes, routines, computer systems, techniques,
15        documentation, designs, procedures, formulas, inventions, improvements,
          concepts, record files, memoranda, reports, drawings, plans, price lists,
16        customer lists or other account information, trade secrets, know-how,
          and/or other intellectual property.

17

18 (NDAs at 1.) The NDAs also provide that certain information shall *not* be considered

19 Confidential Information, including that which:

20        "(a) is or becomes public domain through no action on the part of the
          Receiving Party; (b) is lawfully obtained from any other source other than
21        the disclosing party (the "the Disclosing Party"), without an obligation to
          keep it confidential; (c) is previously known to the Receiving Party without
22        an obligation to keep it confidential, as can be substantiated by written
          records . . .; or (f) is independently developed by the Receiving Party."
23

24 (NDAs at 2.)

25        The Court finds that it is unlikely that Plaintiffs will succeed on the merits of their

26 claim that Defendants violated the NDAs and engaged in unauthorized use of Plaintiffs'

27 confidential and proprietary information. First, none of the items Plaintiffs argue

28 Defendants engaged in unauthorized use of – marketing materials (Pls.' Hr'g Ex. 32, 33,

34), service agreements (*see, e.g.*, Pls.' Hr'g Exs. 39, 41, 50, 118–123), and customer lists[10] – were Confidential Information under the NDAs by being conspicuously marked as confidential. (*See also* Tr. at 94.) To the extent Plaintiffs argue Defendants used Plaintiffs' investor pitch deck, specifically the slide listing Plaintiffs' clients, which was marked as confidential, the client identities listed therein are not confidential under the NDA for the reasons discussed below. Second, before SWI entered into the APA and transferred its related interests to Plaintiffs, the individual Defendants working for SWI attended various trade shows and displayed the names of their customers, which are the same customers that Plaintiffs claim are confidential. (Tr. at 96–99.) Because Plaintiffs' clients' identities were shown to the public at trade shows, and because of the individual Defendants' long-term relationships with their previous clients via SWI, Mr. Corrigan, Director of Operations for Plaintiffs, stated there was no basis on which Defendants should have reasonably understood the client identities, as produced in the client lists used as marketing materials, were confidential. (Tr. at 98.)

The materials Plaintiffs claim are confidential also fall into the specific categories outlined in the NDAs as information that *shall not* be considered Confidential Information. With regard to marketing materials, ELWS's promotional video includes a Powerpoint slide with logos of customers that Plaintiffs allege Defendants took from them. (Pls.' Hr'g Ex. 32.) The customers included on the Powerpoint slide are the same customers that were displayed to the public at the trade shows referenced above, and thus the content of the marketing materials was in the public domain and is not Confidential Information. (*See* NDAs at 2.) In addition, the marketing materials are not Confidential Information under the NDAs because the identity of the clients was previously known to the individual Defendants where those same clients were customers of SWI, with whom

---

[10] Plaintiffs' Closing Brief does not cite to specific exhibits when it refers to "AGT's customer list" that Plaintiffs allege Defendants used in violation of the NDAs. (*See* Pls.' Closing Br. at 13–14.) The Court notes that Plaintiffs' hearing exhibits 3, 4, 33, 34 and 130 include lists of Plaintiffs' and SWI clients. In addition, the APA with the list of former SWI clients was included as an exhibit to Defendants' Bench Brief. (APA at 23–24.) The Court considers these various customer lists in its analysis.

1   Defendants worked, and the individual Defendants were under no obligation to keep the

2   client identities confidential. (*See* Tr. at 94–96, 100; APA at 2.) Similarly, the second

3   type of material Plaintiffs allege Defendants engaged in unauthorized use of – client lists

4   – is non-Confidential Information as identified in the NDAs for the same two reasons.

5   The client lists and identities were put in the public domain at the trade shows and were

6   previously known to the individual Defendants without an obligation to keep that

7   information confidential.

8          As to the service contracts to which Plaintiffs cite, because the individual

9   Defendants worked for and/or with SWI, they were previously aware of the service

10  contract terms, and there is no evidence showing a separate confidentially agreement

11  between SWI and the individual Defendants requiring Defendants to keep the service

12  contract information confidential. (*See* Tr. at 94–96, 100, 103–05; NDAs at 2.)

13  Accordingly, the service contracts are also not Confidential Information. In addition,

14  although it is unclear which individual Defendant may have been responsible for initially

15  creating the customer service contracts while working for and/or with SWI, it is likely

16  that the individual Defendants "independently developed" those contracts that were later

17  transferred to Plaintiffs, further establishing that the service contracts are not Confidential

18  Information under the NDA. (*See* NDAs at 2.)

19         Plaintiffs point to the first clause in the NDAs and argue it expressly states the

20  primary purpose of the NDAs was to protect the parties from disclosure of "***all***

21  proprietary, technical and financial information and documentation." (Pls.' Closing Br. at

22  15) (emphasis in original.) However, the clause does not include the word "all," and the

23  NDAs' more specific provisions defining Confidential Information are clear and not

24  supplanted by the general opening clause.

25         Plaintiffs failed to show that their marking materials, service reports and contracts,

26  and customer lists were conspicuously marked as confidential or that the individual

27  Defendants should have reasonably understood they were confidential. Rather, the

28  present state of the evidence shows that the client lists and marketing materials should not

1    be considered Confidential Information because they were in the public domain and were

2    previously known to the individual Defendants without any obligation between SWI and

3    Defendants to keep the information confidential. The service contracts were also

4    previously known to the individual Defendants without an obligation to keep the

5    information confidential. Accordingly, Plaintiffs are unlikely to succeed on their claim

6    that the individual Defendants violated the NDAs.

7         **C.    Arizona Uniform Trade Secrets Act**

8         Plaintiffs argue that Defendants' disclosure of Plaintiffs' customer lists violated

9    the Arizona Uniform Trade Secrets Act, A.R.S. §§ 44-401–407. (Pls.' Closing Br. at 14.)

10   "To establish a claim for misappropriation of a trade secret, the claimant must first prove

11   a legally protectable trade secret exists." *Calisi v. Unified Fin. Servs., LLC*, 302 P.3d 628,

12   631 (Ariz. Ct. App. 2013). When determining whether a trade secret exists under Arizona

13   law, courts first focus on whether the subject matter of the information is secret, and

14   second, whether reasonable efforts have been taken to keep the information secret. *See*

15   *id.*; A.R.S. §44-401(4). Contrary to Plaintiffs' assertion that customer lists are always

16   considered trade secrets, courts consider a number of factors in making that

17   determination. *See Calisi*, 302 P.3d at 631–34.

18        Here, the subject matter in the customer lists – the identity of the customers – was

19   not secret, and Plaintiffs did not make reasonable efforts to keep the information secret.

20   Plaintiffs were aware that prior to the APA, the individual Defendants had previously

21   shared the names of customers at trade shows and Plaintiffs shared their customer list in

22   their own marketing materials, and thus the client information was publicly available.

23   Plaintiffs also did not provide evidence tending to establish any of the factors that courts

24   consider when determining whether a customer list is a trade secret. *See id.* at 631–32.

25   Accordingly, at this preliminary injunction stage, Plaintiffs fail to show that the customer

26   lists are legally protectable trade secrets and that Defendants have violated the Arizona

27   Uniform Trade Secrets Act. *See id.* at 631; A.R.S. §44-401(4).

28

### D.      Irreparable Harm, Balance of Hardships and Public Interest

For both their patent infringement and violation of confidentiality and NDA claims, Plaintiffs have failed to satisfy their burden of demonstrating they have met the first of the four elements of the preliminary injunction test, and the Court need not consider the remaining three. *See DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776 (9th Cir. 2011); *see also Garcia*, 786 F.3d at 740. However, in some cases, the Ninth Circuit has employed a sliding scale analysis weighing the four factors and has stated that likelihood of success *per se* is not an absolute requirement. *See Drakes Bay Oyster Co.*, 747 F.3d at 1085 (quoting *Cottrell,* 632 F.3d at 1132). The Court finds that Plaintiffs also fail to satisfy their burden under this standard.

Plaintiffs allege they will suffer irreparable harm due to loss of control over their trade secrets, damage to their business goodwill and reputation, and loss of significant market share. (Pls.' Closing Br. at 15–17.) Plaintiffs also allege the balance of hardships tips in their favor because Defendants have been and will continue to take Plaintiffs' clients while infringing on Plaintiffs' patent and providing identical services. (Pls.' Closing Br. at 17–18.) Plaintiffs do not set forth an argument as to the public interest factor. (*See* Pls.' Closing Br.) The Court finds that under the sliding scale analysis, the balance of hardships, irreparable harm to Plaintiffs, and public interest considerations are not so significant as to outweigh Plaintiffs' failure to meet their burden to show serious questions going to the merits or likelihood of success on the merits. *Cf. Cottrell*, 632 F.3d at 1135 (stating "environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration"); *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (finding serious risk of harm to human life constitutes an injury that would be irreparable). Unlike in other cases where courts have found irreparable harm, such as the environmental injuries in *Cottrell* and the potential of death and physical pain in *Shell Offshore*, Plaintiffs' have not shown such significant injury or that their alleged injuries can only be protected through a preliminary injunction rather than monetary damages. *See L.A. Mem'l Coliseum Comm'n*

*v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) (monetary injury is not considered irreparable). The Court concludes that likelihood of success on the merits of Plaintiffs' claims "is too remote to justify the extraordinary remedy of a preliminary injunction." *Drakes Bay Oyster Co.*, 747 F.3d at 1085.

## IV.   CONCLUSION

Plaintiffs are not entitled to a temporary restraining order or preliminary injunction as to their patent infringement and violation of the confidentiality and NDA claims where they did not, by a clear showing, carry their burden of persuasion. *See Mazurek*, 520 U.S. at 972. Plaintiffs did not satisfy their burden as to the first element of the preliminary injunction test – likelihood of success on the merits – and because a preliminary injunction is a drastic and extraordinary remedy never awarded as of right, the Court will not grant an injunction here. *See Drakes Bay Oyster Co.*, 747 F.3d at 1085; *Intel Corp.*, 995 F.2d at 1568.

**IT IS THEREFORE ORDERED** denying Plaintiffs' America Greener Technologies, Inc., American Greener Technologies Corporation, and AGT Softwave, Inc. Application for Temporary Restraining Order and Preliminary Injunction (Doc. 2).

**IT IS FURTHER ORDERED** that, while the Court enters this Order under seal in consideration of the parties' confidential information, the parties shall file under seal joint proposed redactions to this Order by April 4, 2016. The Court will then enter a redacted version of this Order on the public docket.

Dated this 23rd day of March, 2016.

_____
Honorable John J. Tuchi
United States District Judge